ORIGINAL

Approved: /s/ _____
ALEX ROSSMILLER / MATTHEW PODOLSKY
Assistant United States Attorneys

DOC # 1

Before: HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York

22 MAG 6717

------------------------------- x
                                :
UNITED STATES OF AMERICA        :   **SEALED COMPLAINT**
                                :
          - v. -                :   Violations of
RUSSELL DWAYNE LEWIS,           :   18 U.S.C. §§ 1343,
   a/k/a "Clifford Ari Getz,"   :   1028A, and 2
   a/k/a "Clifford Ari Getz Cohen," :
   a/k/a "Ari Getz,"            :   COUNTY OF OFFENSE:
   a/k/a "Aryeh Getz,"          :   NEW YORK
                                :
                Defendant       :
                                :
------------------------------- x

SOUTHERN DISTRICT OF NEW YORK, ss.:

      JOSEPH STRAWMAN, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

COUNT ONE
(Wire Fraud)

      1.  From in or about 2016, up to and including in or about 2020, in the Southern District of New York and elsewhere, RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant, knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, LEWIS falsely claimed to an individual ("Victim-1") that he was a billionaire investor in in order to solicit purported loan and investment payments of at least approximately $3 million from Victim-1, virtually none of which was ever paid back to Victim-1.

(Title 18, United States Code, Sections 1343 and 2.)

1

COUNT TWO
(Wire Fraud)

2. In or about 2020, in the Southern District of New York and elsewhere, RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant, knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, LEWIS falsely claimed to employees and representatives of a corporate entity engaged in a sale of its assets and intellectual property ("Corporation-1") that he was a billionaire and the president of a purported family office trust that invested in distressed organizations, in order to fraudulently induce Corporation-1 to engage in a sale of its intellectual property and assets to LEWIS.

(Title 18, United States Code, Sections 1343 and 2.)

COUNT THREE
(Wire Fraud)

3. In or about 2020, in the Southern District of New York and elsewhere, RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant, knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, LEWIS falsely claimed to a second individual ("Victim-2") that he was a billionaire investor in order to solicit a purported real estate investment of at least approximately $555,000, virtually none of which was ever paid back to Victim-2.

(Title 18, United States Code, Sections 1343 and 2.)

COUNT FOUR
(Aggravated Identity Theft)

4. From in or about 2016, up to and including in or about 2020, RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, LEWIS used, transferred, and possessed the name of another individual in connection with the wire fraud offenses charged in Counts One, Two, and Three of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I am a Special Agent with the Federal Bureau of Investigation, and I have been personally involved in the investigation of this matter. I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents, and conversations that I have had with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Overview of the Fraudulent Schemes**

6. As set forth below, since at least 2016, and up to and including at least 2020, RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant, engaged in a series of brazen schemes to misrepresent his identity, his wealth, and his professional and personal background in order to defraud multiple individuals and at least one corporate entity. For years, LEWIS has been living under assumed names, using the birth date of a real individual with the name of one of his aliases, and utilizing the social security number of yet another individual. As opportunities arose, LEWIS told increasingly outrageous and damaging lies to individuals around him, including a close friend of many years; an individual who turned

3

to him for his claimed expertise in astrology; employees and representatives of a major company he falsely purported to intend to purchase; and employees he "hired" with no intent or ability to pay.

7. In total, RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant, swindled the victims described herein out of more than $3.5 million, driving both Victim-1 and Victim-2 into destitution and bankruptcy, and wasting weeks of time and thousands of dollars of Corporation-1 as it attempted to exit bankruptcy proceedings.

**Fraud Against Victim-1**

8. Based on my participation in this investigation, including my review of records, such as electronic communications obtained voluntarily as well as pursuant to judicially-authorized search warrants; financial, payment, and banking records; and my interviews of individuals, including Victim-1, and my discussions with other law enforcement officers, I have learned the following:

9. Over the course of approximately four years, RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant, befriended Victim-1, became his close friend and confidant, hired him purportedly to help operate and manage a family office worth billions of dollars, and defrauded him out of more than $3 million.

*LEWIS and Victim-1's Personal Relationship*

a. Until he met LEWIS, Victim-1 was a successful businessman living and working in Southern California. In or about 2016, Victim-1 met LEWIS, whom Victim-1 knew as Clifford Ari Getz Cohen. Victim-1 had been working for many years at his family's business. LEWIS and Victim-1 first came to know each other through exercising at the same gym, and they quickly became friends. In the coming months, the friendship between LEWIS and Victim-1 deepened, becoming essentially familial. LEWIS was extremely charismatic, and Victim-1 confided in him about challenges in his personal life and his professional career. In turn, shortly after they met, LEWIS told Victim-1 that he was worth approximately $30 billion, but that he was highly secretive and kept a low profile.

b. LEWIS claimed to Victim-1, in sum and substance, that his wealth was all in trusts and that he did not

4

himself own anything directly. LEWIS further claimed that his wealth came from real estate investments and from standby letters of credit, which he said were highly lucrative. LEWIS told Victim-1 that he directed much of his income to charitable causes, and that he invested the rest in ways that returned profits multiple times over. He stated or implied that all of his assets were overseas, due to the international nature of his claimed businesses, and he occasionally said there were issues with getting his money into domestic accounts.

   c. LEWIS also confided to Victim-1, falsely, that he had worked for the Central Intelligence Agency, that he had been born in London, United Kingdom, that he had lived in an Orthodox Jewish community, and that he was a rabbi. Victim-1 attempted to find information about "Getz" online; when he was unsuccessful, LEWIS told him that the lack of online footprint was intentional. LEWIS claimed, in sum and substance, to be extremely private and reclusive.

   d. As part of their increasingly close friendship, and believing that LEWIS was a successful businessman, Victim-1 solicited professional and investment advice from LEWIS. In approximately July 2016, LEWIS told Victim-1, in sum and substance, that a partner of LEWIS was working on a particular app for businesses. In response, Victim-1 gave LEWIS a significant amount of money for the first time, providing $25,000 for additional development of the purported app and other potential projects. LEWIS drafted a "Memorandum of Understanding" reflecting Victim-1's investment.

   e. During approximately the second half of 2016, LEWIS and Victim-1 began to discuss a possible further business relationship. In particular, they discussed Victim-1's coming to work for LEWIS and sourcing business opportunities in which LEWIS could invest some of his supposedly vast wealth. In approximately early 2017, Victim-1 left his job and began working for LEWIS, including more formally in approximately late 2017 at an office LEWIS appeared to rent. During that time, Victim-1 observed that LEWIS's work was largely unstructured, and he understood that it was his role to, in part, focus LEWIS's attention on worthwhile business opportunities.

   f. During 2017, LEWIS continued to ask Victim-1 for "loans" or investments, and Victim-1 complied. Over time, the relationship between LEWIS and Roberts became closer, to the level of family, and eventually Victim-1 trusted LEWIS completely. Victim-1 viewed LEWIS as a mentor and spiritual guide and started regularly joining LEWIS for religious services

5

and meals, as well as leaning heavily upon LEWIS for support and advice in his personal life.

g. At the same time, Victim-1 was working extensively to explore opportunities in business and finance, to be able to assist LEWIS in identifying productive investment opportunities. LEWIS also continued to ask Victim-1 for money, which was characterized as investments and/or loans, and which Victim-1 routinely provided. Victim-1 believed that LEWIS always had a business reason for asking for money, and Victim-1's belief that the money was being utilized for investment projects was at times bolstered by the very specific amounts LEWIS requested. Victim-1 repeatedly asked about being repaid, and LEWIS consistently promised that Victim-1 would be reimbursed eventually.

*Victim-1's "Employment" for LEWIS*

h. Victim-1 worked for LEWIS between approximately 2017 and 2020. Victim-1's role was to find investment opportunities for LEWIS, particularly in the fashion and retail spaces, in which LEWIS appeared interested. During much of that time, LEWIS had office space in Beverly Hills, California, including two rented suites in the same office building.

i. LEWIS also employed, or appeared to employ, other individuals at his offices. In addition to several individuals who appeared to be working on fashion-related projects, LEWIS, with the assistance of Victim-1, hired an individual in approximately March 2020 ("Individual-1"). Individual-1 had a background in business administration, including auditing and work in finance and operations for startup companies. Individual-1 initially was hired as Chief Accounting Officer for LEWIS, who described the job responsibilities as including helping with due diligence, tracking financial investments, and researching and evaluating investment opportunities. In particular, LEWIS told Individual-1 that he was looking for high-growth opportunistic investments. LEWIS told Individual-1, in sum and substance, that his company was funded entirely by his and his family's money, and that there was plenty of liquidity to make investments and purchases. Shortly after Individual-1 was hired, Individual-1 was promoted to Chief Financial Officer. LEWIS falsely represented to Individual-1 that he was worth more than $10 billion. LEWIS promised Individual-1 an annual salary of hundreds of thousands of dollars; she was never actually paid.

6

j.  Victim-1 and Individual-1 both worked on evaluating possible investments and acquisitions. Neither one had visibility into any accounts in the name of "Getz" or any of his purported companies. However, they believed he had the money to make the investments they researched, some of which he suggested and some of which they proposed. Victim-1 undertook due diligence on several possible deals between 2018 and 2020; although none of the deals came to fruition, LEWIS always had a reason or explanation. In 2020, at LEWIS's direction, both Victim-1 and Individual-1 spent time working directly with representatives of companies for possible investments, undertaking significant efforts to, for example, review and edit term sheets, examine data, and perform due diligence. When a payment date would approach for a deal, however, LEWIS would say that his money was tied up abroad, and that he was unable to access his wealth. LEWIS also blamed the COVID pandemic, which he said made international banking difficult.

k.  In particular, and as further described below, both Victim-1 and Individual-1 were involved with the negotiations regarding Corporation-1. Victim-1 saw an article online about the bankruptcy proceedings of Corporation-1 and brought it to LEWIS's attention. LEWIS claimed to be interested in purchasing Corporation-1, and Victim-1 and Individual-1 contacted representatives of Corporation-1 to convey LEWIS's offer to purchase the company for approximately $290 million.

l.  In the following weeks, Victim-1 and Individual-1 both spent significant time and effort to pursue the bid and to undertake due diligence. That included, but was not limited to, reviewing relevant Corporation-1 leasing deals, real estate holdings, and cash flow information, as well as other financial and business materials and records. Victim-1 and Individual-1 also interacted extensively with representatives from Corporation-1. Nevertheless, as described below, LEWIS never went through with that offer.

m.  Individual-1 continued working for LEWIS through approximately late 2020 or early 2021. Individual-1 was never paid any of the promised salary, and eventually stopped working for LEWIS and ceased contact with him in early 2021. Similarly, Victim-1 was never paid any meaningful amount of money and no longer had contact with LEWIS after approximately spring 2021.

n.  By 2020, Victim-1 had transferred more than $3 million of loan and/or investment funds to LEWIS in less than three years. Those payments were made on approximately more than 25 occasions, including via wire and bank transfers

7

occurring in the Southern District of New York. That total was essentially all of Victim-1's liquid assets, including money from his retirement savings and proceeds from the sale of his house. Even as Victim-1 lost all liquidity, including taking cash advances on his credit cards and considering bankruptcy, he continued paying for certain LEWIS-related expenses through at least in or about June 2021, including certain business expenses. Following that period, Victim-1 was evicted from his apartment and ultimately filed for personal bankruptcy.[1]

### Fraud Against Corporation-1

10. Based on my participation in this investigation, including my review of records, such as electronic communications obtained voluntarily as well as pursuant to judicially-authorized search warrants; financial, payment, and banking records; my review of consensually-recorded phone calls; and my interviews of individuals, including Victim-1 and representatives of Corporation-1, and my discussions with other law enforcement officers, I have learned the following:

11. In or about August and September 2020, RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant, fraudulently tried to acquire Corporation-1 and its assets. As described above, that offer resulted in weeks of due diligence processes, legal discussions, and negotiations, including through which Getz, Victim-1, and Individual-1 had access to certain of Corporation-1's internal business records and materials. Corporation-1 and its representatives dedicated significant time and resources to the purported offer. Those efforts were based on the false premise that LEWIS intended to, and could, pay hundreds of millions of dollars for Corporation-1.

---

[1] Victim-1 was first interviewed by Special Agents of the Federal Bureau of Investigation in approximately April 2021. In that initial interview, as Victim-1 has subsequently acknowledged, he was not candid. In particular, he claimed not to have attempted to purchase any companies with LEWIS, not to have worked with him for approximately a year and a half prior to the interview, and not to know if LEWIS had substantial wealth. In subsequent interviews, Victim-1 acknowledged this lack of candor and expressed remorse; Victim-1 has said that during the first interview, he still felt a strong bond with LEWIS and wanted to protect him. Victim-1 has since provided information to law enforcement that has been independently corroborated, and he has entered into a non-prosecution agreement with the United States Attorney's Office for the Southern District of New York.

8

*Initial Contact With Corporation-1*

a.     In or about early August 2020, Corporation-1 initiated bankruptcy proceedings and solicited bids for its business, including with the assistance of counsel. On approximately August 4, 2020, Victim-1 emailed counsel to Corporation-1, stating that he was the President of "Neviim Equity," a "family office trust looking to invest in distressed organizations." The email expressed possible interest in purchasing the assets of Corporation-1, and it copied "C. Ari Getz" as well as Individual-1, who was identified as the Chief Financial Officer of Neviim. Days after that introduction, LEWIS made a purported all-cash offer to purchase Corporation-1 and a related entity for $290 million.

b.     Shortly thereafter, Victim-1 and Individual-1 began engaging in due diligence proceedings with counsel and strategic advisors to Corporation-1. Following extensive communications regarding the offer and related due diligence, on or about August 12, 2020, representatives of Corporation-1 had a videoconference call with Victim-1, Individual-1, and "Clifford Getz." During the videoconference, LEWIS, purporting to be Getz, said in sum and substance that he was worth approximately more than $18 billion, which he said he had made primarily through the sale of real estate assets.

c.     On or about August 13, 2020, as part of the due diligence process, a representative of Corporation-1 requested, among other materials and documentation, a bank statement from a U.S. bank showing sufficient funds to complete the acquisition. Due diligence and negotiations also continued during the following days.

*The Fraudulent Bank Letter and Additional False Statements*

d.     On or about August 21, 2020, LEWIS sent to Individual-1, and copying himself, a letter appearing to be from a multinational bank headquartered abroad (the "Fraudulent Bank Letter"). In sum and substance, the Fraudulent Bank Letter purported to confirm the existence of an account at the bank for the benefit of "Rabbi Clifford Getz" holding cash in the amount of €300 million. In particular, the Fraudulent Bank Letter stated that the bank was "ready, willing and able to issue cash-backed Standby Letter of Credit in the amount [of €300 million] for the benefit or Rabbi Clifford Getz, Trustee to the designated beneficiary account immediately upon your instruction." The Fraudulent Bank Letter was dated "20th August 2020" and appeared to be signed by two bank employees. Approximately 30 minutes after LEWIS emailed the Fraudulent Bank

Letter, Individual-1 sent it to representatives of Corporation-1. Upon receipt of the Fraudulent Bank Letter, those representatives attempted to confirm its legitimacy by contacting one of the bank's representatives, who stated in sum and substance that the letter was fraudulent. Indeed, the relevant account identified was not associated with LEWIS, or with any of his aliases, and its actual holdings were dramatically less than the amount stated in the Fraudulent Bank Letter. The representatives of Corporation-1 then contacted law enforcement and began cooperating with the investigation.

        e.    In the following weeks, LEWIS continued to proceed as if the purchase offer was legitimate but repeatedly refused to provide any additional proof of funds information. In one call between LEWIS, Victim-1, Individual-1, and representatives of Corporation-1, which was recorded, LEWIS made representations that, among other things, Neviim "buy[s] hundreds of millions of dollars from pharmaceuticals" and that he engaged in "very humanitarian projects around the globe." LEWIS also stated that his funds were being routed through, and had been delayed by, "banks all around the globe."

        f.    During the recorded call, LEWIS further claimed to be 68 years old, to have grown up in London, and to have a PhD in theoretical mathematics and statistics, a master's degree in neurophysics, a master's degree in genetics, and a master's degree in quantum physics. None of those claims were true. Additionally, a representative of Corporation-1 on the call stated to LEWIS that he understood LEWIS was worth $18 billion, and LEWIS did not deny or correct the statement, but rather referenced his desire for privacy. Shortly thereafter, LEWIS and his associates stopped communicating with representatives of Corporation-1, and the deal was never completed.

### Fraud Against Victim-2

    12.    Based on my participation in this investigation, including my review of records, such as electronic communications obtained voluntarily as well as pursuant to judicially-authorized search warrants; financial, payment, and banking records; and my interviews of individuals, including Victim-2, and my discussions with other law enforcement officers, I have learned the following:

    13.    In addition to his purported business activities, RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant, also charged some individuals for astrological

readings and analyses that he performed for them. One such individual was a widow with four children who met LEWIS in or about 2018 ("Victim-2"). Victim-2 continued to have contact with LEWIS in the coming years, including for astrological readings. In or about 2020, over the course of serval months, LEWIS defrauded Victim-2 out of approximately $555,000 by pressuring her into paying him money for a purported investment opportunity. In truth, there was no such investment opportunity, and LEWIS spent Victim-2's money on personal expenses, including office supplies that facilitated and promoted LEWIS's other schemes.

  a. In early 2020, Victim-2 met LEWIS, who purported to be able to provide astrology readings. Victim-2 paid LEWIS for that service, and over the course of several months he provided her with readings and advice. LEWIS told Victim-2 that he was a billionaire, and that it was in her chart to get her mortgage paid off and to obtain financial freedom. LEWIS also claimed, among other things, that he had previously been in the U.S. military and had worked for the Secret Service for most of his career, that he worked for and had friends in the Los Angeles Police Department and Beverly Hills Police Department, that he performed astrological readings for police officers and for a particular tech company billionaire, and that he assisted in picking the jury for the OJ Simpson trial based on his astrological readings and charts.

  b. Some time thereafter, in approximately late March 2020, LEWIS offered Victim-2 a "guaranteed" investment opportunity in connection with a purported real estate development. Specifically, he said the deal involved a real estate project that was in progress but unfinished, and he said the investment opportunity would help Victim-2 escape her financial troubles. LEWIS told her that in exchange for an investment of $300,000, she would get back $575,000, and he provided her with a post-dated check for that amount as the "guarantee."

  c. Victim-2 initially declined, explaining that she could not afford the investment. LEWIS told her she would be paid back within two weeks, and that he already had committed to the investment so she could not back out. LEWIS ultimately convinced Victim-2 to agree, and she wired him $300,000, to an account with a bank headquartered in New York City (the "Lewis Account") on or about March 30, 2020. LEWIS gave her a check for $575,000, post-dated for April 15, 2020 (the "First Post-Dated Check"), written from the Lewis Account, and he told her she could deposit it then.

11

    d. When Victim-2 expressed concern about the First Post-Dated Check, LEWIS laughed and said, in substance, that he was a billionaire and would not risk going to jail over writing a bad check. When LEWIS wrote the First Post-Dated Check in late March, prior to receiving the $300,000 from Victim-2, the Lewis Account held less than $10,000. On or about April 15, 2020, the date for which the First Post-Dated Check was written, and following extensive transfers and expenditures by LEWIS after receiving $300,000 from Victim-2, the Lewis Account held less than $7,000.

    e. On or about April 15, 2020, LEWIS told Victim-2 that the real estate investment was short by an additional $255,000. He said that if Victim-2 gave him that amount, he could get her back an additional $1,000,000. When Victim-2 hesitated, LEWIS told her, in sum and substance, that he had organized the investment for her, and had put his neck out for her, and that she was being ungrateful. Victim-2 acquiesced, and she wired LEWIS the additional $255,000 on April 16, 2020. At approximately the same time, LEWIS gave Victim-2 a check for $1,000,000, post-dated for April 28 (the "Second Post-Dated Check"). At the time Victim-2 sent the $255,000, the Lewis Account held less than $7,000; on April 28, it held less than $1,000.

    f. On or about April 27, 2020, LEWIS told Victim-2 not to deposit the checks he had given her, and that instead he would wire her the money directly. He subsequently claimed he had the money in an account, and that he had transferred it to Victim-2; he also claimed that a new check would be sent to her instead. As days and weeks went by, Victim-2 became increasingly desperate to be repaid. Over the course of the following weeks and then months, LEWIS told Victim-2 not to cash the post-dated checks, for a variety of reasons, assuring her that she would eventually get the money she was owed. LEWIS falsely claimed, among other things, that he was suing banks for failing to release his vast funds.

    g. On or about July 29, 2020, LEWIS told Victim-2 that LEWIS's son had gone to a branch of a New York bank to have a check drawn. LEWIS said his son would sign the check and that the bank would mail it to Victim-2. On or about August 1, Victim-2 received texts from a New York phone number, with the prefix 917, purporting to be LEWIS's daughter and claiming that a check was being sent via FedEx; no such check ever arrived.

    h. In or about September 2020, LEWIS told Victim-2 she could deposit the First Post-Dated Check, for

12

$575,000; when she attempted to, it bounced due to insufficient funds. On or about September 18, when LEWIS told Victim-2 she could deposit the check, the account from which the check was written contained less than $1,000.

    i. LEWIS subsequently told Victim-2, in sum and substance, that if she went to the police over the check bouncing, he would get a slap on the wrist and then would declare bankruptcy so she would never recover her money. Victim-2 continued to attempt to communicate with LEWIS to get back her stolen funds through the end of 2020, after which she reported the fraud to law enforcement.

### False Identifying Information and Identity Theft

   14. Based on my participation in this investigation, including my review of records, such as electronic communications obtained voluntarily as well as pursuant to judicially-authorized search warrants; financial, payment, and banking records; and my interviews of individuals including those described above, and my discussions with other law enforcement officers and public officials, I have learned that the person who perpetrated these offenses under a variety of aliases is in fact RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant.

    a. In communications including certain of those described above, LEWIS has identified himself as, or been referred to by others as, among other names, "Ford Getz," "Ari Getz," "Clifford Ari Getz," and "Aryeh Getz." He appears to have been using a combination of similar aliases since at least in or about 2016.

    b. In a 2018 credit card application with a bank headquartered in New York City, LEWIS listed his name as "Clifford Getz" and his date of birth as a particular date in 1982 (the "Fraudulent DOB"). Based on my review of documents, I have learned that there is an individual residing in the United States who has that same first and last name, with a different middle name, and who was in fact born on the Fraudulent DOB date ("Victim-3"). In the same credit card application, LEWIS listed his social security number as a particular number (the "Fraudulent SSN"). The Fraudulent SSN was not issued to anyone with the last name Lewis or Getz; rather, it is the social security number of an approximately 13-year-old child residing in Ohio.

13

          c.    LEWIS also used the Fraudulent SSN and the Fraudulent DOB in applications for at least two additional credit cards. Similarly, in client information documents submitted by LEWIS to a bank in or about February 2020 (the "Fraudulent Client Documents Submission"), his name is listed as "Clifford Getz" and the document lists his social security number as the Fraudulent SSN and his date of birth as the Fraudulent DOB.

          d.    The Fraudulent Client Documents Submission also included a photocopy of a passport (the "Fraudulent Passport") in the full name of Victim-3, including Victim-3's middle name, and listing the Fraudulent DOB. The Fraudulent Passport contains a photograph that I believe, based on a review of photos of Victim-3, is not a photograph of that individual and instead is a photo of LEWIS. The Fraudulent Passport was issued by the U.S. Government based on an application that included, among other information, the full name of Victim-3 and the Fraudulent DOB.

WHEREFORE the deponent prays that RUSSELL DWAYNE LEWIS, a/k/a "Clifford Ari Getz," a/k/a "Clifford Ari Getz Cohen," a/k/a "Ari Getz," a/k/a "Aryeh Getz," the defendant, be arrested and imprisoned or bailed, as the case may be.

JOSEPH STRAWMAN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
16th day of August 2022

THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

14